**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALMALITA ROBERTSON,

*Plaintiff*,

v.

TRAVIS HILL,

*Defendant*.

Civil Action No. 25-3754 (TJK)

**MEMORANDUM OPINION**

Almalita Robertson sues her employer, the Federal Deposit Insurance Corporation, or FDIC, asserting claims for race and sex discrimination, retaliation, and a hostile work environment. The FDIC moves to dismiss, arguing that Robertson has failed to exhaust or otherwise failed to state a claim. The Court agrees with the FDIC, so it will grant the motion and dismiss the complaint.

## I. Background

Robertson, an African American woman, has worked as an analyst at the FDIC for over thirty years. ECF No. 1 ("Compl.") ¶¶ 3, 5. Until 2023, she held the position of Financial Management Analyst in the agency's Corporate Management Control division. *Id.* As Robertson tells it, her more recent years at the FDIC have been marked by a pattern of discrimination, hostility, and denial of promotional opportunities. *Id.* ¶ 7. The problems started in May 2016 when she was not selected for a higher-grade Senior Management Analyst position—while "[l]ess qualified" white and male individuals were selected instead. *Id.* And in June 2018, she says her "African American supervisor, Mr. Elroy Holden, accused her of having an intern do her work while pointing in her face and loudly shouting at her." *Id.* ¶ 9.

That incident prompted Robertson to seek "reassignment away from Holden's supervision." Compl. ¶ 9 (citation modified). But, Robertson says, "FDIC management denied [those] repeated requests." *Id.* In 2019, she twice applied for higher-grade Management Analyst positions but was "passed over" for "[l]ess qualified individuals outside of [her] protected classes." *Id.* ¶ 7. The FDIC's explanations for her non-selection, Robertson says, were "inconsistent, unsupported by documentation, and contradicted by her objective qualifications." *Id.* ¶ 8. Not only that, "[t]he FDIC failed to adhere to standard . . . evaluation procedures and used irregular . . . methods that disadvantaged [her] compared with similarly situated candidates." *Id.* So, in December 2020 and again in February 2021, Robertson and four of her female African American colleagues met with management to raise concerns about discrimination against African American women. *Id.* ¶¶ 18–19.

During that same period, Robertson says her supervisor, Holden, "escalated his hostility." Compl. ¶ 13. In one incident, he allegedly "displayed hostility" upon "enter[ing] [her] office, pointed his finger in her face, yelled at her, and stormed out." *Id.* ¶ 10. Robertson further alleges that Holden "failed to address [her] concerns regarding overtime pay and credit hours . . . [thus] disregarding her rights and workload," threatened to deny her leave or coerced her into canceling her leave, and "stripped [her] of several of her duties and reassigned them to [others]." *Id.* ¶¶ 12–14. In addition to Holden, Robertson alleges that other members of FDIC management "demeaned" her by comparing her relationship with Holden to that of an "old married couple" and circulating a "disparaging email about [her] to numerous FDIC employees." *Id.* ¶¶ 10–11.

Robertson alleges that, in November 2021, Holden made her train another employee, "further burdening her without proper recognition or opportunity for advancement," and also spoke to her on one occasion in a "loud and hostile tone." Compl. ¶ 15. That same month, she alleges

"FDIC management structured [a job] posting for a Senior Management Analyst position . . . in a way that ensured [Robertson] could not apply or qualify for the position." *Id*. In December 2021, she was again not selected for a promotion to a more senior Management Analyst position, prompting her to contact the agency's Equal Employment Opportunity ("EEO") counselor "to address the discrimination and harassment she was facing." *Id.* ¶ 16. Robertson says that Holden soon became aware of her EEO activity and mentioned it in her presence. *Id.* ¶ 17. On February 23, 2022, Robertson "filed a formal EEO complaint alleging race, sex, and retaliation-based discrimination." *Id.*; *see also* ECF No. 9-1 at 9–10.[1] Two days later, Holden issued her "a letter of warning for an alleged infraction that had occurred over a month earlier." *Id.* ¶ 17.

An Administrative Law Judge denied Robertson's claims and the Equal Employment Opportunity Commission affirmed. *See* ECF No. 9-1 at 17–38. Robertson then sued the FDIC's then-Acting Chairman, Travis Hill, on October 23, 2025, asserting three claims under Title VII of the Civil Rights Act of 1964.[2] *See generally* Compl. First, she claims race and sex discrimination related to her 2016, 2019, and 2021 non-selections. *Id.* ¶¶ 25–34 (Count I). Second, she brings a hostile-work-environment claim based on a "repeated and escalating hostility from [Holden] and other FDIC management officials" from 2018 to 2022. *Id.* ¶¶ 35–49 (Count II) (citation modified). And third, she claims those same officials retaliated against her by issuing a warning letter, referencing her protected activity in meetings, and "structuring job postings in ways that excluded

[1] The FDIC attaches Robertson's EEO complaint and related documents as exhibits to its motion to dismiss. *See* ECF No. 19-1. When, as here, "a defendant moves to dismiss for failure to state a claim on the ground that the plaintiff has failed to exhaust her administrative remedies, the Court may consider the plaintiff's official EEO complaint and any attachments . . . without converting the motion to one for summary judgment." *Achagzai v. Broad. Bd. of Governors*, No. 17-cv-612, 2018 WL 4705799, at *2 (D.D.C. Sept. 30, 2018) (citing *Coleman v. Duke*, 867 F.3d 204, 210 & n.4 (D.C. Cir. 2017)).

[2] For simplicity's sake, the Court refers to Defendant as the FDIC.

her." *Id.* ¶¶ 50–61 (Count III). The FDIC moves to dismiss all of Robertson's claims under Federal Rule of Civil Procedure 12(b)(6). ECF No. 8.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (citation modified). The Court construes all factual inferences in favor of the plaintiff when considering a Rule 12(b)(6) motion. *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). When defendants allege that plaintiffs have failed to administratively exhaust their Title VII claims, courts typically resolve the exhaustion question in the context of a Rule 12(b)(6) motion. *Augustus v. Locke*, 699 F. Supp. 2d 65, 69 n.3 (D.D.C. 2010).

## III. Analysis

### A. Race and Sex Discrimination (Count I)

Robertson alleges in Count I that she was not selected for a Management Analyst position in December 2021 because of her race and sex. Compl. ¶¶ 29, 31. She also alleges that she was the victim of discrimination in connection with other non-selections for promotion in 2016 and 2019. *Id.* But, as the FDIC argues, she has failed to exhaust these latter two allegations as standalone discrimination claims. *See* ECF No. 8 at 12–13; ECF No. 9-1 at 11–12. So the Court addresses those first.

"A plaintiff may file a Title VII . . . action in federal court only after exhausting her administrative remedies before the relevant federal agency for each allegedly discriminatory act."

*Smith v. Lynch*, 106 F. Supp. 3d 20, 41 (D.D.C. 2015) (collecting cases). Exhaustion requires three steps. First, the employee seeking redress for discrimination, retaliation, or a hostile work environment must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Then, "[i]f counseling is unsuccessful," the employee "must file . . . a formal complaint with the agency." *Chan v. FCC*, No. 17-cv-921 (TJK), 2018 WL 1210869, at *2 (D.D.C. Mar. 8, 2018) (citation modified). Finally, the "employee may seek relief in federal court only after an agency issues a final adverse decision or 180 days have elapsed, whichever comes first." *Id.* Although "Title VII's exhaustion requirements are not jurisdictional," *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011), "if an employee fails to meet any of those statutory or regulatory deadlines, [her] federal court action may be dismissed for failure to administratively exhaust the claim," *Niskey v. Kelly*, 859 F.3d 1, 7 (D.C. Cir. 2017).

Robertson initiated informal contact with her EEO office on December 13, 2021, and filed her EEO complaint on February 23, 2022. Compl. ¶ 55. Thus, she may base her discrimination claim in Count I only on discrete acts occurring on or after October 29, 2021 that she pressed in her EEO complaint and that were investigated by and exhausted before the agency. *See* ECF No. 9-1 at 11–12. Robertson all but concedes that this excludes her allegations from 2016 and 2019, *see* ECF No. 12 at 9, leaving only her December 2021 non-selection for a more senior Management Analyst position. But she is right, as discussed below, that the Court may consider them as background evidence supporting her discrimination claim. *See Ellison v. Napolitano*, 901 F. Supp. 2d 118, 128 (D.D.C. 2012). The Court now turns to her December 2021 non-selection.

To establish a prima facie case of unlawful discrimination under Title VII, Robertson must show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action;

and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). A materially adverse employment action causes "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Although a plaintiff need not plead "every fact necessary to establish a prima facie case" to state a claim, *Jones v. Air Line Pilots Ass'n, Int'l.*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (citation omitted), she still must plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). That includes pleading facts "sufficient to allow a plausible inference that the challenged action was taken *because of* [her protected characteristics]." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) (emphasis added).

The FDIC argues that Robertson has not plausibly alleged that she was not selected for the Management Analyst position in December 2021 because of her race or sex. ECF No. 8 at 16–19.[3] On this score, Robertson does not allege any direct evidence of discrimination, such as "discriminatory comments" made by an official who was responsible for her non-selection. *Graves-Buckingham v. Mullin*, No. 22-cv-1459, 2026 WL 2123157, at *4 (D.D.C. July 23, 2026). Rather, she alleges that, despite her "extensive qualifications, experience, and institutional knowledge," a "less qualified individual[] outside of [her] protected classes w[as] selected" for the position. Compl. ¶¶ 28–30. She adds that the FDIC "failed to follow standard selection procedures, used subjective interview scoring to justify its preferred outcome, and offered shifting

[3] The FDIC does not dispute that Robertson has adequately alleged the other elements of a Title VII discrimination claim: as an African American woman, she is a member of two protected classes under Title VII. Compl. ¶ 3; *see* ECF No. 8 at 16–19. And her allegation that she was not selected for a position qualifies as an adverse action.

explanations" for her non-selection—treatment which "[s]imilarly situated white and male employees . . . were not subjected to." *Id.* ¶ 32. Finally, Robertson offers statistical data showing a purported underrepresentation of African Americans and women in the FDIC's upper-level workforce. *See id.* ¶ 21.

The FDIC contends that these allegations are too conclusory and lack sufficient factual detail to allege a plausible discrimination claim. In other words, it argues that the allegations do not contain enough facts from which it can be inferred that Robertson was denied the promotion *because of her race or sex*. The FDIC is right.

Begin with Robertson's assertion that the FDIC picked a less qualified candidate "outside of [her] protected class[]" for the position. Compl. ¶ 30. True, a plaintiff may plead an inference of discrimination "by showing that she was treated differently from similarly situated employees who are not part of the protected class." *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (citation modified). And while Robertson need not "identify the comparators," or allege "specific acts" at the motion to dismiss stage, *Keith v. U.S. Gov't Accountability Off.*, 21-cv-2010, 2022 WL 3715776, at *5 (D.D.C. Aug. 29, 2022), she must plead enough facts to "show[] [that] the comparators are in fact 'similarly situated' in some meaningful respect," *Joyner*, 140 F.4th at 531. So merely asserting that she was passed over for "less qualified individuals outside of [her] protected class" falls well short of the mark. Compl. ¶ 30. Indeed, that is the type of "threadbare recital of a legal conclusion, devoid of further factual enhancement" that courts routinely reject. *Joyner*, 140 F.4th at 531 (citation modified). In short, her allegations about "unnamed comparator employees with no information about their . . . relevant characteristics are . . . far too general to nudge [her discrimination] claims across the line from conceivable to plausible." *Dukes v. Carnahan*, 24-cv-1826, 2025 WL 2761593, at *2 (D.D.C. Sept. 29, 2025) (citation modified).

Next, Robertson's assertions that the FDIC "failed to follow standard selection procedures, used subjective interview scoring to justify its preferred outcome, and offered shifting explanations" fare no better. Compl. ¶ 32; *see also id.* ¶ 8. Vague and conclusory allegations of rigged or irregular procedures, without more, do not nudge her claims from conceivable to plausible. Indeed, Robertson does not identify any procedures the FDIC flouted, describe how any scoring or rating system disadvantaged her, or point out any conflicting explanations given for her non-selection. *Cf. Bagwe* v. *Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016) (holding that an employer's "explanations *must actually be shifting and inconsistent* to permit an inference of mendacity") (emphasis added). She does not even allege facts from which the Court could infer that the relevant decisionmaker at the FDIC even knew of her race and sex. In the end, Robertson "has not proffered facts supporting an inference that any unfair treatment was based on her membership in a protected class." *Hudson v. United States*, No. 23-cv-318, 2024 WL 2278382, at *3 (D.D.C. Mar. 31, 2024).

Her allegation that three "[s]imilarly situated white and male employees . . . were not subjected to comparable treatment" also falls short. Compl. ¶ 32. Assuming she means to identify comparators, to repeat, it is "[not] enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator." *Joyner*, 140 F.4th at 531. Apart from name, race, and sex, the only facts Robertson pleads about these three purported comparators are their job titles. *See* Compl. ¶¶ 32, 40. But "general allegations about [these] comparators do not provide a meaningful benchmark against which to assess whether [the FDIC]'s treatment of h[er] was . . . motivated" by race or sex. *Joyner*, 140 F.4th at 533. Without any information at all about their relative "experience, seniority, or expertise," *Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013), "the Court cannot reasonably infer that all of the relevant aspects of [her]

employment situation[] were nearly identical to those of the other employees who did not suffer similar adverse employment actions," *Mills v. Hayden*, No. 04-cv-2205, 2024 WL 4697733, at *15 (D.D.C. Nov. 6, 2024) (citation modified).

More fundamentally, Robertson does not allege that any of these would-be comparators applied for, were considered for, or were ultimately selected for the position she sought. *See Hicks v. D.C. Water & Sewer Auth.*, No. 24-cv-2288 (TJK), 2025 WL 2439161, at *3 (D.D.C. Aug. 25, 2025) (coworker was not a proper comparator because he had not "sought promotion to [the same] position or grade" as the plaintiff). Nor does she allege that the same decisionmakers involved in her non-selection were also involved in the promotion of these other employees. *See Joyner*, 140 F.4th at 533 ("[W]hether the same decisionmakers were involved [in an employment decision] is relevant to whether two employees were similarly situated.").

Indeed, other allegations put forth by Robertson, if anything, cut against any inference that discrimination based on her race or sex was afoot in her December 2021 non-selection. Recall that she alleges that, between December 2020 and February 2022, she and four other African American women "raised concerns" with FDIC managers about discrimination and lack of advancement opportunities for black women. Compl. ¶ 18, 53. Yet Robertson alleges that "she was the only one" of these African American women "who was neither promoted nor compensated." *Id*. ¶ 20. As a general matter, that hardly bespeaks discrimination in promotion at the FDIC. Moreover, because these co-workers share Robertson's protected characteristics, they "cannot be . . . proper comparator[s]" for discrimination claims. *Hicks*, 2025 WL 2439161, at *3. And, in any event, Robertson does not allege that the same decisionmaker(s) that rejected her also promoted or compensated these employees. *See id*.

In sum, Robertson's "general allegations about [these] comparators do not provide a meaningful benchmark against which to assess whether [the FDIC]'s treatment of [her] was . . . motivated" by race or sex. *Joyner*, 140 F.4th at 533. Thus, at the very most, the Court can only "infer . . . the mere possibility of misconduct." *Hicks*, 2025 WL 2439161, at *4. That is not enough to state a discrimination claim under Title VII.

Robertson also bases her discrimination claim on purported racial and gender disparities in the FDIC's workforce. *See* Compl. ¶ 21. She points to 2018–2020 "reports" "show[ing] that while African Americans made up roughly 17% of the workforce, they accounted for only about 11–12% of the Executive Manager workforce." *Id.* "Women," she adds, "[were] similarly . . . underrepresented in senior management." *Id.* "Although it is possible to make a *prima facie* case of disparate treatment based solely on statistics, in order to do so plaintiffs must present a 'significant' pattern of discrimination unexplainable on grounds other than race." *Davis v. Dist. of Columbia*, 925 F.3d 1240, 1255 (D.C. Cir. 2019) (citation omitted). Robertson's statistical data falls well short for two reasons.

First, simply alleging a five or six percent racial disparity in the "Executive Manager workforce," does not, standing alone, support an inference of discrimination with respect to her non-selection for promotion to the Management Analyst position in December 2021. Compl. ¶ 21 Indeed, Robertson does not contextualize these "raw percentages" with "the number of individuals at [the Executive Management] level, the qualifications of individuals in the applicant pool and of those hired [], or the number of openings at [this] level." *Burgis v. New York City Dep't of Sanitation*, 798 F.3d 63, 70 (2d Cir. 2015); *see id*. (affirming denial of § 1981 discrimination claim based on statistics "show[ing] only the raw percentages of White, Black, and Hispanic individuals at each employment level"). Without that context, her allegations do not "permit the inference

that, absent other explanation[s], the disparity more likely than not resulted from illegal discrimination." *Segar v. Smith*, 738 F.2d 1249, 1274 (D.C. Cir. 1984) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 368 (1977)).[4]

Indeed, Robertson offers no information about the applicant pool for the FDIC's "Executive Management workforce." To support an inference of discrimination, the statistics a plaintiff marshals must compare the composition of the relevant workforce with "the *qualified* population *in the relevant labor market*." *Davis v. Califano*, 613 F.2d 957, 963 (D.C. Cir. 1979) (emphasis added). But here, Robertson does not allege that the 17-percent African American "workforce" referenced in the complaint matches the pool of qualified individuals in the relevant labor market for "Executive Management" positions. *See Mandala v. NTT Data, Inc.*, 975 F.3d 202, 210–11 (2d Cir. 2020) ("General population statistics are a reliable surrogate only when there is reason to think that they accurately reflect the pool of qualified job applicants for the position in question.") (citation modified).

Second, as the FDIC argues, Robertson does not "allege that the [Management Analyst] position she sought would have placed her" within senior management or the "Executive Manager" tier. ECF No. 8 at 19. In other words, she "fails to allege any statistical disparity among the *specific position*[] that [is] the subject of [an] allegedly discriminatory practice." *Brown v. Mayorkas*, 20-cv-3107 (TJK), 2023 WL 3303862, at *12 (D.D.C. May 8, 2023). Indeed, merely pointing out a purported racial or gender disparity in one rung of the FDIC's workforce sheds no light on "the reasons for [Robertson's] *individual* . . . treatment," as opposed to "the relative

[4] Robertson's conclusory allegation that women were "underrepresented in [the FDIC]'s senior management" is on even weaker footing. Compl. ¶ 21. She does not say what percentage of employees in those positions are women, much less allege any data on the percentage of women in the relevant applicant pools for those positions.

treatment of different groups within the workplace." *Whitener v. England*, No. 4-cv-273, 2006 WL 3755220 (D.D.C. Dec. 19, 2006) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).[5]

Finally, as noted above, Robertson argues that unexhausted allegations of non-selection in 2016 and 2019 are evidence that supports her discrimination claim. But those allegations are of no help to her, because they suffer from the same deficiencies as her December 2021 non-selection allegations, as described above.[6] Nor does Robertson connect these disparate incidents in any meaningful way, for example, by alleging that the same decisionmakers were involved.

**B. Retaliation (Count III)**

Robertson alleges that FDIC personnel retaliated against her for reporting misconduct internally to FDIC managers and through the formal EEO process, including by initiating contact with EEO counselors on December 13, 2021, and filing an EEO complaint on February 23, 2022. *See* Compl. ¶¶ 50–61. They did so, she alleges, by (1) issuing her a "warning" letter for an alleged infraction on February 25, 2022, (2) "referencing her EEO activity in performance and billing

[5] To the extent Robertson also purports to base her discrimination claim on the FDIC's February 2022 warning letter, *see* ECF No. 12 at 13–15, she comes up short too. She does not allege that the letter even mentions her race or sex. *Cf. Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 125 (D.D.C. 2014) (supervisor's comment was not evidence of religious discrimination where it "d[id] not clearly refer to Plaintiff's religion"). Nor does she plausibly allege that the letter caused any "harm respecting an identifiable term or condition of employment," such that it could qualify as the basis for a discrimination claim. *Muldrow*, 601 U.S. at 355. Accordingly, the Court need not reach the FDIC's argument that the letter is not an independently actionable "personnel action," 42 U.S.C. § 2000e-16(a), as that term has been interpreted by the Supreme Court in other circumstances, ECF No. 8 at 22 (citing *Babb v. Wilkie*, 589 U.S. 399, 410 (2020)); *see Phelan v. Noem*, No. 24-cv-939, 2025 WL 2732749, at *7 (D.D.C. Sept. 25, 2025) (rejecting the "argument that *Babb* requires federal-sector Title VII plaintiffs to make a different showing than private-sector Title VII plaintiffs to establish an adverse employment action").

[6] For these same reasons, Robertson's allegations of non-selection in 2016 and 2019 would fail as stand-alone discrimination claims, even if they had been administratively exhausted.

meetings" in January 2022 and (3) "structuring job postings in ways that excluded her" in November 2021. Compl. ¶¶ 56–57. The FDIC is right again that she has not stated a plausible claim.

To state a retaliation claim, Robertson must show "that [s]he opposed a practice made unlawful by Title VII; that [her] employer took a materially adverse action against [her]; and that [her] employer took the action because the employee opposed the practice." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (cleaned up). A "materially adverse" action is one that "might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation omitted), and it typically involves a "significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," *Bridgeforth*, 721 F.3d at 663. The FDIC argues that each of Robertson's allegations fail to show either material adversity or causation. The Court agrees.

To begin, Robertson alleges that, two days after filing her formal EEO complaint, she received a "letter of warning" from her supervisor, Holden, about "an alleged infraction that had occurred over a month earlier." Compl. ¶ 56. This letter, she says, was veiled "punishment" and "an act of reprisal" "for her EEO activity." *Id.* ¶¶ 17, 56.

The problem for Robertson is that she alleges nothing about the letter's contents—much less that it imposed any disciplinary consequences or "a significant change in [her] employment status." *Hockaday v. Washington Metro. Area Transit Auth.*, No. 23-7085, 2024 WL 2229699, at *3 (D.C. Cir. May 17, 2024). In general, a "reprimand letter," even one containing "job-related constructive criticism" or "allegations of deficient work performance[,] is not a materially adverse action absent a showing that [it] would have dissuaded a reasonable employee from engaging in

protected activity." *Durant v. Dist. of Columbia Gov.*, 875 F.3d 685, 698 (D.C. Cir. 2017)). A letter can have that effect if it contains "abusive language," or imposes "tangible job consequence." *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008). Such consequences may include, among other things, "a change in grade, salary, or other benefits," *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2003), reductions in the quality of responsibilities, *Holcomb v. Powell*, 433 F.3d 889, 902–03 (D.C. Cir. 2006), or other "financial harms," *Baloch*, 550 F.3d at 1199. But Robertson does not contend that the letter contained any such thing.[7] *See* Compl. ¶¶ 17, 56–57. At bottom, she does not allege anything suggesting that the letter's contents or effect might dissuade a reasonable employee from engaging in protected activity. *See Beachner v. Howard Univ.*, No. 25-7058, 2026 WL 2071133, at *3 (D.C. Cir. July 17, 2026) ("[R]eprimands . . . in the workplace . . . without more, do not amount to materially adverse actions of the kind that can support a retaliation claim.").

Robertson argues that the letter's retaliatory nature is evident from the "broader pattern" of "antagonism" and "retaliatory conduct" including "exclusion from opportunities, continuing hostility, and direct references to her EEO activity." ECF No. 12 at 15, 17. This argument fails. To state a claim for unlawful retaliation, Robertson must allege a discrete act having a materially adverse effect on a term or condition of her employment that was caused by her protected activity. Merely asserting that an act is part of broader "retaliatory context" is not enough. *Id.* at 17. Put differently, a plaintiff cannot transform an otherwise insufficient act into retaliation simply by casting it as part of an overall "pattern" of retaliation. In addition, as explained below, none of the

[7] For that reason too, as explained elsewhere, Robertson has not pleaded facts plausibly suggesting that the letter can form the basis for a discrimination claim. *See Acon-Chen v. Duffy*, No. 24-cv-1529, 2026 WL 1998768, at *7 (D.D.C. July 10, 2026) ("[R]eprimand [letters] that are 'not abusive and d[o] not lead to disciplinary action' do not amount to adverse employment actions under Title VII.") (citation modified).

other conduct Robertson alleges in Count III and attempts to fold into this "retaliatory context" is itself actionable retaliation, for one reason or another.

Begin with Robertson's allegation that Holden also "referenc[ed] her EEO activity in performance and billing meetings" in January 2022. Compl. ¶¶ 17, 57. "Comments directed at an employee, especially from a supervisor, can constitute an adverse employment action," but only when they are "so severe as to affect the terms of employment." *Keeley v. Small*, 391 F. Supp. 2d 30, 43 (D.D.C. 2005). Holden's comments signaling mere awareness of Robertson's EEO activity fall well short of the mark. As courts have held, a supervisor's references to protected activity, even when accompanied by harsh language, do not generally constitute actionable retaliation. For instance, in *Keeley v. Small*, the court held that a supervisor's comment "that he was 'sick of [plaintiff's] lawsuit bullsh—,'" in reference to her EEO complaint, did not amount to actionable retaliation. *Id.* Although the comment was "certainly . . . vulgar, and even . . . show[ed] that plaintiff's protected activity was on the mind of his supervisors," the court held that the remark was "not actionable [retaliation]," because "[t]here [wa]s no evidence that [it] hindered plaintiff's performance or had any effect on the terms of his employment." *Id.* So too here. Indeed, Robertson's allegations are even weaker than those in *Keeley*, as she does not allege that Holden used coarse language or referenced her protected activity in an aggressive or threatening manner. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) (holding that a supervisor yelling "[y]our career is dead . . . if you file the [EEO] claim" was not a materially adverse action).

Robertson's allegation that the FDIC "structur[ed] job postings in a way that excluded her" fares no better. Compl. ¶ 57. The FDIC does not dispute that this allegation checks the "material adversity" box; still, it argues that Robertson has not plausibly alleged causation. *See* ECF No. 8 at 27. Robertson responds that causation is evident from "chronology"—*i.e.*, that the FDIC posted

the offending vacancy after she "raised concerns about systematic barriers to promotion." ECF No. 12 at 15. But the timeline is more attenuated than Robertson lets on. Generally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). A plaintiff can show causation based "solely on the fact that an adverse action *shortly* follow[s] the plaintiff's protected activity." *Ho v. Garland*, 106 F.4th 47, 52 (D.C. Cir. 2024) (emphasis added). And though there is no "bright-line . . . rule," the Supreme Court has suggested that even a "three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation." *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Here, the FDIC posted the vacancy in November 2021—nine months after the most recent time Robertson alleges that she contacted management, in February 2021. That is too long a gap to support an inference of causation. *See, e.g.*, *Sussman v. Axonius, Inc.*, No. 23-cv-1822, 2026 WL 879195, at *7 (D.D.C. Mar. 31, 2026) (finding an 8-to-9-month gap too long); *Ho*, 106 F.4th at 52 (finding a ten-month gap too long). Moreover, as the FDIC argues, Robertson does not plausibly allege facts from which the Court could infer that any officials involved in the November 2021 posting knew about her protected activity, "which is a requirement for any retaliation claim."[8] *Ho*, 106 F.4th at 53; *see Barber v. Am. Sec. Bank*, 655 F. Supp. 775, 779 (D.D.C. 1987) ("As a

[8] Relatedly, although Robertson does not press the point, she cannot base her retaliation claim on her December 2021 non-selection for the Management Analyst position. That decision came *ten* months after her February 2021 protected activity—and again, Robertson does not allege any facts to show that the relevant decisionmaker there knew of her protected activity.

matter of law, there can obviously be no retaliation if the [alleged] retaliator did not know about the protected activity.”).[9]

### C. Hostile Work Environment (Count II)

Finally, Robertson alleges that the FDIC subjected her to a hostile work environment because of her race and sex “beginning in 2018 and continuing through 2022.” Compl. ¶ 38; *id.* ¶¶ 35–49. She points to a pattern of “repeated and escalating hostility from her supervisor, Mr. Holden, and other FDIC management officials,” including threats, demeaning comments, exclusion from advancement opportunities, and loss of job responsibilities. *See id.* ¶¶ 38–39, 41–43.[10] These allegations come up short too.

---

[9] For similar reasons, Robertson’s vague and conclusory allegation in Count III that the FDIC “subject[ed] her to hostile treatment” does not state a retaliation claim. Compl. ¶ 57. Indeed, to the extent Robertson seeks to assert a retaliatory hostile work environment claim, it fails. To state such a claim, she “must allege that the employer subjected her to retaliatory intimidation, ridicule, and insult of such severity or pervasiveness as to alter the conditions of her employment and create an abusive working environment.” *Carson v. Dist. of Columbia*, No. 21-cv-3208, 2026 WL 2546293, at *12 (D.D.C. Aug. 28, 2026) (citation modified). But a “retaliatory hostile work environment claim” cannot succeed where it “rests largely on the same alleged acts that the court has found do not, individually or taken together, state a substantive retaliation claim.” *Nguyen v. Del Toro*, No. 23-cv-2022, 2024 WL 3638338, at *4 (D.D.C. Aug. 2, 2024). Nor could she base such a claim on the same allegations supporting her hostile work environment claim. As the Court explains below, those allegations do not demonstrate conduct so severe or pervasive as to affect the terms and conditions of her employment.

[10] The FDIC does not dispute that Robertson exhausted a hostile work environment claim based on the time frame and alleged incidents at issue. ECF No. 8 at 11–12. The Supreme Court has held that “[h]ostile environment claims are different in kind from discrete acts” because “[t]heir very nature involves repeated conduct.” *Nat’l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, as long as “[one] act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.” *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (citation modified). But that does not mean plaintiffs have “an open sesame to recovery for time-barred violations.” *Id.* Only acts that “involve the same type of employment actions, occur relatively frequently, and are perpetrated by the same managers” can form part of a hostile work environment claim. *Id.* (citation omitted).

"To state a hostile work environment claim, a plaintiff must plausibly allege facts that, if true, would support a reasonable inference that misconduct occurred that was so severe that it changed []a 'term, condition, or privilege' of employment within the meaning of Title VII." *Hunter v. Rubio*, No. 24-cv-480 (TJK), 2026 WL 496871, at *6 (D.D.C. Feb. 23, 2026) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "This is a high bar designed to filter out complaints attacking the ordinary tribulations of the workplace and prevent federal civil rights statutes from imposing a general civility code." *Davis v. Vilsack*, No. 17-cv-245 (TJK), 2023 WL 6065012, at *10 (D.D.C. Sept. 18, 2023) (citation modified). And where, as here, a plaintiff asserts a pattern of hostile treatment, the "constituent acts must be adequately linked such that they form a coherent hostile environment claim," *Baird v. Gotbaum*, 792 F.3d 166, 168–69 (D.C. Cir. 2015) (citation modified), otherwise the court may "conclude that . . . acts are so different in kind and remote in time from one another that they cannot possibly comprise part of the same hostile work environment," *Faisan v. Vance-Cooks*, 896 F. Supp. 2d 37, 66 (D.D.C. 2012).

Spelling trouble for Robertson from the beginning, given the deficiencies discussed above—including her reliance on vague and conclusory allegations that merely parrot the legal standard—she has not pleaded facts suggesting that the purportedly hostile treatment she suffered plausibly "ha[d] anything to do with h[er] race" or sex. *Robinson v. Dist. of Columbia.*, No. 23-cv-3823, 2024 WL 4722157, at *6 (D.D.C. Nov. 8, 2024); *see Nurridin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (holding that, for a hostile work environment to be actionable, "it must be clear that the hostile work environment was the result of discrimination based on protected status").

Compounding that glaring omission, her allegations—both individually and collectively—are not sufficiently severe or pervasive to state a hostile-work-environment claim. Turning first to

Robertson's allegations about her supervisor, Holden—Robertson says, "on multiple occasions," Holden "pointed in [her] face, shouted at her, and threatened to deny her leave, stripped her of duties, and demeaned her in front of her colleagues." Compl. ¶ 39. Specifically, she says that Holden "accused her of having an intern do her work for her while pointing in her face and loudly shouting at her," "entered [her] office, pointed his finger in her face, yelled at her, and stormed out," and "demeaned [her] in front of colleagues by speaking in a loud and hostile tone." *Id.* ¶¶ 9, 10, 15. But "disparaging remarks, criticisms of [the plaintiff's] work, and other negative comments" such as these, even when accompanied by occasional yelling and raised voices, do not make a hostile work environment. *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (citing *Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002)); *see Akosile v. Armed Forces Ret. Home*, 938 F. Supp. 2d 76, 87 (D.D.C. 2013) ("Negative interactions with supervisors, even when a supervisor yells and uses profanity, generally do not meet [the hostile work environment] standard."); *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 7 (D.D.C. 2019) (allegations that supervisor "yelled at [plaintiff] in front of her colleagues on two occasions" and was "'unfairly critical' of her work" did not state claim for hostile work environment); *Hogan v. Hayden*, 406 F. Supp. 3d 32, 54 (D.D.C. 2019) ("[L]ost tempers and workplace disagreements . . . are the kind of ordinary tribulations of the workplace into which the court cannot wade.") (citation omitted).

The complaint also describes a series of workplace disputes between Robertson and Holden over things like overtime pay, leave, resources and training, and job responsibilities. But these alleged incidents, while perhaps "unpleasant, amount[] to little more than everyday workplace disputes" that are not actionable under Title VII. *Singleton v. Potter*, 402 F. Supp. 2d 12, 43 (D.D.C. 2005). For instance, Robertson says Holden "stripped [her] of several . . . duties and reassigned them to" others, Compl. ¶ 14,—but "allegations of 'the removal of important

assignments' . . . are . . . not enough to state a hostile work environment claim," *Tyes-Williams*, 361 F. Supp. 3d at 8. Nor are her allegations that Holden failed to address her concerns about overtime pay and leave—or that he "tried to coerce [her] into cancelling her previously approved leave." Compl. ¶ 113. As courts have held, these kinds of "routine personnel disputes between employees and managers" do not rise above the ordinary tribulations of the workplace. *Jackson v. Acedo*, No. 8-cv-1941, 2009 WL 2619446, at *3 (D.D.C. Aug. 26, 2009).[11] In short, "[a]lthough [Robertson] has alleged many ways in which her supervisor[] made her life unpleasant . . . the alleged misconduct simply does not rise to t[he] level" of a hostile work environment. *Harrigan v. Carson*, No. 17-cv-930 (TJK), 2019 WL 4737119, at *3 (D.D.C. Sept. 28, 2019).[12]

Aside from Holden, Robertson alleges that other FDIC officials contributed to a hostile atmosphere. One manager, Robertson says, "compared her relationship with Mr. Holden to that of an 'old married couple,'" and another "circulated a disparaging email about [her] to numerous FDIC employees." Compl. ¶¶ 10–11. But these allegations fail to move the needle. Robertson never explains how these statements are "adequately linked" to Holden's alleged conduct such that

[11] *See Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 88 (D.D.C. 2014) ("[D]enial of [plaintiff's] requests for days off, scheduling changes, or other accommodations to his employment . . . did not create an objectively hostile environment."); *Swann v. Off. of the Architect of Capitol*, 73 F. Supp. 3d 20, 32 (D.D.C. 2014) ("[W]ork-related" actions such as a denial of overtime "are not sufficiently severe or offensive to support a hostile work environment claim."). The same goes for Robertson's allegation that Holden withheld resources, like interns, or that he made her train a coworker. *See Tyes-Williams*, 361 F. Supp. 3d at 8 (plaintiff's allegation that he was denied "certain training" "nowhere near satisf[ies] the . . . standard" for a hostile work environment) (citation modified); *see Newton v. Off. of the Architect of the Capitol*, 840 F. Supp. 2d 384, 398 (D.D.C. 2012) (holding that "complaints over undesirable job responsibilities and . . . workload" do not amount to "severe and pervasive" conduct necessary to support a hostile work environment claim).

[12] In addition, Robertson's allegation that the FDIC refused to transfer her to another supervisor does not render her hostile work environment claim viable. *Cf. Beckwith v. Ware*, 174 F. Supp. 3d 1, 5 (D.D.C. 2014), *aff'd*, No. 15-5102, 2015 WL 9005393 (D.C. Cir. Nov. 6, 2015) (conduct including denial of plaintiff's transfer request did not create a hostile work environment).

they form a "coherent hostile environment claim." *Turner v. United States Capitol Police Bd.*, 983 F. Supp. 2d 98, 109 (D.D.C. 2013), *aff'd sub nom.*, 653 F. App'x 1 (D.C. Cir. 2016) ("[I]n order for allegations to qualify as part of the same hostile work environment claim they must . . . involv[e] the same type of employment actions, occur[] relatively frequently, and *[be] perpetrated by the same managers*.") (emphasis added) (citation modified). Moreover, even assuming Robertson had adequately linked these allegations to Holden's conduct, they do not support a hostile work environment claim. As for the "old married couple" remark, "gender-related jokes, and occasional teasing" are insufficiently serious to create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). And without more information about what the purportedly "disparaging" email said, that allegation falls well short of stating a hostile-work-environment claim. *See Dorival v. Cole, Scott & Kissane*, No. 25-11224, 2026 WL 972792, at *1 (11th Cir. Apr. 10, 2026) (affirming that "extremely vague' allegations regarding 'harassing' emails . . . [are] insufficient" to state a hostile work environment claim).

In sum, although Robertson alleges a laundry list of conflicts with Holden—and a few with other FDIC officials—between 2018 and 2022, "the pattern of events she alleges is simply not severe enough." *Harrigan*, 2019 WL 4737119, at *3; *see Baird*, 792 F.3d at 172 ("[A] long list of trivial incidents is no more a hostile work environment than a pile of feathers is a crushing weight."). Moreover, "the alleged events are temporally diffuse[] [and] spread out over a four-year period, suggesting a lack of pervasiveness." *Harrigan*, 2019 WL 4737119, at *3. Accordingly, Robertson has not alleged a pattern of hostility so extreme and pervasive as to alter the terms or conditions of her employment.[13]

[13] Robertson's allegations as to the November 2021 job posting do not tip her hostile-work-environment claim into plausibility. *See* Compl. ¶ 41. The Court has as already concluded that these allegations do not state a claim for retaliation. And when a plaintiff cannot "prevail on a

## IV. Conclusion

For all these reasons, the Court will grant the FDIC's motion and dismiss the complaint. A separate order will issue.

Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 11, 2026

standalone . . . claim," the same discrete, discriminatory act generally cannot "constitute 'severe or pervasive' harassment for purposes of a hostile work environment claim." *Floyd v. Lee*, 85 F. Supp. 3d 482, 518 (D.D.C. 2015) (quoting *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013)).